# In the United States Court of Federal Claims

OFFICE OF SPECIAL MASTERS

| | | |
|---|---|---|
| KELSEY AND RYAN JARANILLA, on behalf of their minor daughter BJ, | * | No. 22-428V |
| Petitioners, | * | Special Master Christian J. Moran |
| v. | * | Filed: August 26, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

Michael Avrim Firestone, Marvin Firestone, MD, JD and Associates, San Mateo, CA, for petitioner;
Lauren Kells, United States Dep't of Justice, Washington, DC, for respondent.

**PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS**[1]

Kelsey and Ryan Jaranilla ("petitioners" or "Mr. and Ms. Jaranilla") alleged that various childhood vaccines their daughter, B.J., received on July 27, 2020, caused B.J. to suffer from encephalopathy and cerebral palsy. After the case was pending for about three years, they filed a motion to dismiss the case. This motion was granted, and Mr. and Ms. Jaranilla did not receive compensation.

Mr. and Ms. Jaranilla now seek an award of attorneys' fees and costs. The Secretary opposes on the ground that Mr. and Ms. Jaranilla have not satisfied one of the prerequisites for a discretionary award of attorneys' fees and costs, namely, reasonable basis for the claim set forth in the petition.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

The Secretary's opposition is well founded. The evidence does not support finding that Mr. and Ms. Jaranilla possessed reasonable basis at any time during the litigation. Thus, the motion for attorneys' fees and costs is denied.

## I. Events in B.J.'s Life

B.J. was born in January 2020 at approximately 40 weeks gestation. At birth, she had trouble breathing and was successfully resuscitated. She was transferred to a hospital providing a higher level of care and stayed in a neonatal intensive care unit for 48 hours before being discharged.

During the next six months, B.J. was developing normally. She received various vaccinations without any adverse effect noted. See Exhibit 5 at 44-67 (records of well-child appointments with the pediatrician); see also Exhibit 1 (Ms. Jaranilla's affidavit) at 1.

On July 27, 2020, at an appointment with the pediatrician, the parents reported no concerns. The pediatrician assessed that she was ahead of developmental milestones. B.J. received the third doses of vaccines for diphtheria-tetanus-acellular pertussis, Hemophilus b conjugate, hepatitis B, pneumococcus, inactivated polio, and rotavirus. (Collectively, these are referred to as "childhood vaccines"). Exhibit 5 at 41.

In the next two weeks, B.J. appeared normal. Her parents were not worried about her. Exhibit 1 at 1-2.

Sixteen days after the vaccination, B.J. was shaking and had clear fluid coming from her mouth. She was taken to an emergency department for possible seizure. Exhibit 4 at 9. The doctor recognized a "spasm-like seizure with right sided gaze preference and muscle rigidity." Id. at 10. Her temperature was 100.8 degrees Fahrenheit. She had respiratory failure and required intubation. Id.

Once she was stabilized, B.J. was transported to a children's hospital. Exhibit 4 at 13. Her brain MRI was abnormal. Exhibit 6 at 132, 454. At discharge, a doctor commented that B.J. might have a metabolic disorder. Id. at 125. The discharging neurologist stated: "Diagnostically, it remains unclear if this represents a severe systemic viral infection or a viral illness unmasking a metabolic disorder." Id.

B.J.'s development regressed. Exhibit 5 at 35 (pediatrician's record, dated Aug. 28, 2020). Over the next year, doctors continued to treat B.J., who remained on anti-seizure medication. For details, see Pet., filed Apr. 12, 2022, at 6-9; Resp't's Rep., filed Oct. 22, 2022, at 6-9. During this period, doctors did not link the childhood vaccinations to B.J.'s neurological disorder. See, e.g., Exhibit 6 at 107 (an October 2, 2020 report from a pediatric neurologist stating she "suspect[s] this was an infectious/viral process though we did not identify a pathogen"); Exhibit 5 at 19 (a January 11, 2021 report from B.J.'s pediatrician noting that her parents were "understandably concerned about vaccinations as her seizures started shortly after

her last [shot]"); Exhibit 6 at 68 (a February 5, 2021 report from the pediatric neurologist noting that she and B.J.'s parents discussed whether the vaccinations could have caused B.J.'s problem and memorializing the neurologist's assessment that it is "possible this could have been triggered by vaccination, though it doesn't fit cleanly into a post-vaccination syndrome").

In March 2021, a neurologist, Jennifer Yuen, assessed B.J. as suffering from "Epilepsy, unspecified, not intractable, with status epilepticus; Delayed attainment of expected physiological developmental stage." Exhibit 9 at 24. Dr. Yuen characterized B.J.'s status epilepticus and regression as having an "unknown etiology." Id. Dr. Yuen ordered a genetic epilepsy panel through Invitae. Exhibit 9 at 11, 15. This panel, which contained whole exome sequencing, showed that B.J. had some genetic polymorphisms, specifically that B.J. was a carrier for tyrosine hydroxylase deficiency and had six additional variants of uncertain significance. Exhibit 9 at 28; see also Exhibit 28 at 1 (Dr. Yang's report that B.J. previously had "extensive genetic work up including WES [whole exome sequencing]"). However, these genetic variants did not explain her seizures. See Exhibit 9 at 4 (Dr. Yuen: genetics told the family that the "genetics testing did not amount to any particular diagnoses"). Later, a different neurologist, Amy Yang, proposed that whole genome testing might be appropriate. Exhibit 28 at 1 (July 15, 2022). Whole genome sequencing ultimately identified variants in the WARS2 and COQ8A genes. Although these findings prompted additional RNA sequencing, the subsequent RNA testing was negative. See Exhibit 33; Pet'rs' Status Report, filed Dec. 20, 2024.

## II. Procedural History

### A. Events before the Petition was Filed

Ms. Jaranilla communicated with vaccine attorney Michael Firestone on June 27, 2021.[2] Ms. Jaranilla provided him with some medical records, which Attorney Firestone spent about one hour reviewing. On June 29, 2021, Attorney Firestone emailed Lawrence Steinman, a neurologist who often serves as an expert for the Vaccine Program, about whether the claim was viable and forwarded the medical records Ms. Jaranilla had sent to him. Dr. Steinman recommended consulting with a geneticist as well.

Over the next approximately nine months, paralegals gathered medical records. They also prepared the petition. The attorneys and paralegals drafted affidavits, which were filed with the petition. During this stage, there was minimal consultation done with any experts. See entry for Feb. 3, 2022.

---

[2] Information about the activities of the attorneys and their staff can be found in various invoices, which were attached to the motion for attorneys' fees beginning at pdf 51.

### B. Petition

Petitioners alleged that the childhood vaccines caused B.J. to suffer from encephalopathy and cerebral palsy 16 days after the vaccinations on July 27, 2020. Pet., filed Apr. 12, 2022, at 1-3. They filed medical records and affidavits over the next few months.

### C. Remainder of Entitlement Phase

After the petition was filed, Attorney Firestone renewed inquiries with Dr. Steinman. Entry for June 3, 2022. Attorney Firestone also contacted Dmitriy Niyazov, who has occasionally assisted petitioners in the Vaccine Program. Attorney Firestone and other professionals in the law firm frequently communicated with Dr. Steinman and Dr. Niyazov. For example, on August 4, 2022, Dr. Niyazov informed Attorney Firestone that there is "a lag of time between vaccines on 7/27/20 and appearance of symptoms on 8/12/20 while she appeared 'normal' between those dates. MRI on 8/13/20 appears to be more of an acute nature [rather] than an after-effect from 2 weeks prior." Pet'rs' Fees Mot. at pdf 95.[3] Dr. Niyazov's focus on the time between the childhood vaccines and the onset of neurologic problems is consistent with an assessment of B.J.'s pediatrician. See Exhibit 5 at 6 ("This history would be quite unusual in the case of a vaccine-related event"). In this context, Dr. Niyazov advised that B.J. "may need a more thorough genetic workup to see if she has [a] mitochondrial disease or another inborn error of metabolism." Id. After discussions about Dr. Niyazov's retainer, he agreed to review the case.[4]

Meanwhile, the Secretary reviewed the evidence and recommended against an award of compensation. Resp't's Rep., filed Oct. 21, 2022. The Secretary argued that petitioners had not

---

[3] Mr. and Ms. Jaranilla attached email correspondence involving Attorney Firestone and Dr. Niyazov, including correspondence referring to Dr. Steinman's involvement, to their motion for attorneys' fees and costs. The attachments to the motion are not separately identified as exhibits. The emails appear toward the end of the package.

[4] Mr. and Ms. Jaranilla contend that the Vaccine Program's reasonable basis standard "encourages petitioners to engage counsel early and retain appropriate experts, thereby ensuring that claims are fully vetted before proceeding to litigation. *That is precisely what occurred here*." Pet'rs' Fees Mot. at 4 (emphasis added). However, the chronology does not support that characterization. While Mr. Firestone emailed Dr. Steinman within about two days of conferring with Ms. Jaranilla, the pre-filing consultation did not produce clear affirmative expert support. Mr. Firestone communicated with Dr. Niyazov only after the petition was filed, thus it is not apparent that the claim was "fully vetted" when the petition was filed as Mr. and Ms. Jaranilla contend. Mr. Firestone had not secured favorable causation opinions from either Dr. Steinman or Dr. Niyazov when the petition was filed. This is not to suggest that Petitioners were required to complete their investigation or obtain a favorable expert opinion before filing. It means that the

provided preponderant evidence satisfying any of the Althen prongs between B.J.'s condition and any of the vaccines. Resp't's Rep. at 10-11. Further, the Secretary noted that petitioners had not submitted an expert report in support of their claim, and that none of B.J.'s treating doctors opined that the vaccines caused her condition. Id. at 10.

In the first status conference, the undersigned noted that the latency (16 days) between the vaccination and the onset of seizures seemed to make a causal association difficult. Attorney Firestone stated that Dr. Niyazov is recommending testing of the whole genome to see if B.J. was genetically susceptible to an adverse reaction to a vaccine. Attorney Firestone wondered whether the Vaccine Program would pay for the testing. Mr. and Ms. Jaranilla were directed to request this relief through a formal motion. Order, issued Nov. 22, 2022.

Mr. and Ms. Jaranilla filed a "Motion for Disbursement of Funds" on January 17, 2023. The Secretary deferred to the special master's discretion. Resp't's Resp., filed Feb. 20, 2023. Mr. and Ms. Jaranilla submitted some information about their financial circumstances. Exhibits 29-32. The Secretary argued that the motion should be denied. Resp't's Resp. to First Motion for Disbursement of Funds, filed Apr. 25, 2023. The Secretary argued that Mr. and Ms. Jaranilla had not incurred a "cost" that was eligible for reimbursement. The Secretary also argued that they had not established a reasonable basis for their claim. Id. at 10-13.

Mr. and Ms. Jaranilla's motion was treated as a motion for an award of attorneys' fees and costs. It was denied. Interim Fees Decision, 2023 WL 8259246, issued Nov. 1, 2023. The motion was denied based upon the Secretary's first argument, which was that Mr. and Ms. Jaranilla had not incurred the cost of genetic testing. The Interim Fees Decision did not evaluate reasonable basis.

In evaluating Mr. and Ms. Jaranilla's motion for disbursement of funds, the undersigned learned that Mr. and Ms. Jaranilla's insurance company, United Healthcare, which had originally denied a request for whole genome testing, had changed its policy. The undersigned disclosed this information. Order, issued Nov. 1, 2023, submitting Court Exhibit 1001.

B.J. underwent whole genome testing. Mr. and Ms. Jaranilla filed the results of that testing as Exhibit 33 on July 12, 2024. The testing revealed that B.J. had a heterozygous variant in the *WARS2* gene.[5] The genetics laboratory interpreted this variant as "likely pathogenic."

---

record does not support their particular contention that the claim was "fully vetted" before litigation began.

[5] "Heterozygous" means that a person has different alleles. Dorland's Illus. Med. Dictionary 846 (33rd ed.) By way of contrast, "homozygous" means a person has identical alleles. Id. at 858.

The testing also revealed B.J. had a heterozygous variant in the *COQ8A* gene. The genetics laboratory stated that "the clinical significance of this variant is uncertain." Exhibit 33 at 5.

Attorney Firestone communicated with Dr. Niyazov about the results of whole genome sequencing. Entry for July 9, 2024. Attorney Firestone wrote that according to Dr. Niyazov, WARS2 is "associated with autosomal recessive conditions, requiring two variants on opposite alleles (maternal and paternal) to cause disease." Pet'rs' Status Rep., filed July 12, 2024, at 1-2. Mr. and Ms. Jaranilla wanted to pursue RNA testing.

In response to petitioners' status report, a status conference was scheduled to discuss the feasibility of maintaining the claim. Mr. and Ms. Jaranilla were expected to discuss why Dr. Niyazov was stating that two copies of the WARS2 gene were required when the genetics laboratory identified B.J. as having a heterozygous variant that was "likely pathogenic." Order, issued July 22, 2024.

A status conference was held. Despite another status report filed on August 22, 2024, it remained unclear why Dr. Niyazov was saying "two pathogenic variants . . . are typically required." Mr. and Ms. Jaranilla were ordered to obtain a report from him. Order, issued Aug. 22, 2024.

On September 23, 2024, petitioners filed a letter from Dr. Niyazov. Exhibit 34. Dr. Niyazov opined that the recent findings on the Whole Genome Sequencing point to a potential genetic diagnosis of primary coenzyme Q10 deficiency-4 (COQ10D4). Id. at 1. Dr. Niyazov stated that RNA testing could prove invaluable in finding a rare cause of B.J.'s condition and could explain a role of the vaccines in B.J.'s condition. Id. at 2. Dr. Niyazov cited one article and two entries from the website Online Mendelian Inheritance in Man (omim.org) regarding primary coenzyme Q10 deficiency. Id. These reference materials generally submit similar information. For example, the medical article states that a "Primary Coenzyme $Q_{10}$ ($CoQ_{10}$) deficiency is generally inherited in an autosomal recessive manner." Exhibit 35 (Leonardo Salviati et al., "Primary Coenzyme $Q_{10}$ Deficiency Overview," in Gene Reviews [internet] MP Adam et al., ed. (2024) at 12; accord Exhibit 36 at 1 ("Primary coenzyme Q10 deficiency-4 (COQ10D4) is an autosomal recessive disorder characterized by childhood-onset of cerebellar ataxia and exercise intolerance"). None of these reference materials discuss vaccinations as contributing to this condition.

Mr. and Ms. Jaranilla were directed to file a status report regarding B.J.'s RNA sequencing results. Order, issued Sept. 25, 2024. Mr. and Ms. Jaranilla filed B.J.'s RNA sequencing results and a status report indicating the results of B.J.'s RNA testing were reported as negative. Pet'rs' Status Rep., filed Dec. 20, 2024, at 2.

After being called upon to propose next steps for their case, Mr. and Ms. Jaranilla filed a motion to dismiss their case. They stated that after "an exhaustive investigation of the facts and science surrounding this case has led [p]etitioners to conclude that they cannot meet their burden of proof to demonstrate entitlement to compensation." Pet'rs' Mot., filed Jan. 30, 2025, at 1.

Mr. and Ms. Jaranilla's case was dismissed. The basis for dismissal was that they failed to present a medical theory causally connecting the vaccinations with the injury. Entitlement Decision, filed Feb. 4, 2025, 2025 WL 604404, at *2, citing Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

**D. Attorneys' Fees and Costs Phase**

Mr. and Ms. Jaranilla requested an award of attorneys' fees and costs, which includes costs that they have incurred personally. They maintained that reasonable basis and good faith support the claim. Pet'rs' Fees Mot., filed Aug. 4, 2025, at 3.[6] For reasonable basis, the basic argument is: "Petitioners[] and their counsel pursued the claim based on both clinical facts and expert medical support. Petitioners [sic, missing word might be "retained"] two multiple highly credentialed experts to investigate a plausible theory of vaccine-induced injury." Id. They elaborated that "Dr. Niyazov provided a medical opinion suggesting a plausible genetic predisposition (COQ8A-associated mitochondrial dysfunction) that could have been exacerbated by vaccination. He recommended additional testing that formed the basis of continued investigation (see Ex. 20, 34)." Id. at 4.

Referencing his objection regarding reasonable basis when Mr. and Ms. Jaranilla requested interim fees to pay for genetic testing, the Secretary argued that the evidence falls short of the reasonable basis standard. Resp't's Resp., filed Sep. 5, 2025, at 12. In the Secretary's view, there was insufficient evidence to satisfy the reasonable basis standard when the petition was filed and additional evidence did not cure this deficiency.

Mr. and Ms. Jaranilla maintained that they satisfied the reasonable basis standard. They emphasized their investigation of multiple causes for B.J.'s condition. Pet'rs' Reply, filed Sep. 19, 2025. With the submission of the reply, the motion is ready for adjudication.

## III. Standards for Adjudication

To be entitled to compensation, petitioners must establish five elements, which are found in 42 U.S.C. § 300aa–11(c)(1)(A)-(E). When petitioners establish all five elements with preponderant evidence (and respondent does not establish an alternative factor explaining the medical disorder), petitioners are entitled to receive compensation. 42 U.S.C. § 300aa–13. One type of compensation successful petitioners receive is an award of reasonable attorneys' fees and costs. 42 U.S.C. § 300aa–15(e).

By way of contrast, petitioners who did not establish entitlement are not awarded attorneys' fees and costs automatically. The Vaccine Act grants special masters discretion to award attorneys' fees and costs upon a showing of two items: "that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42

---

[6] The motion for fees could be organized better.

U.S.C. § 300aa–15(e).[7] As the fee applicants, Mr. and Ms. Jaranilla bear the burden of demonstrating reasonable basis. McKellar v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 297, 305 (2011).

It is well established that the standard of establishing reasonable basis is lower than a preponderance of the evidence.[8] The Federal Circuit stated: "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337, 1346 (Fed. Cir. 2020). However, the Federal Circuit did not define a "scintilla." Petitioners meet their evidentiary burden with "objective evidence." Id. at 1344. In categorizing medical records as objective evidence, the Federal Circuit stated, "[m]edical records can support causation even where the records provide only circumstantial evidence of causation." Id. at 1346. Finally, the Federal Circuit in Cottingham specified that "we make no determination on the weight of the objective evidence in the record or whether that evidence establishes reasonable basis, for these are factual findings for the Special Master and not this court." Id. at 1347.

As to what must be shown with a scintilla of evidence, the Federal Circuit has offered some guidance. The same five elements necessary to establish entitlement to compensation can be considered in determining whether a petition was supported by a reasonable basis. Cottingham, 971 F.3d at 1345-46. In Cottingham, the disputed item concerned causation, which is subparagraph C in section 11(c)(1) of the Vaccine Act.

Furthermore, according to the Court of Federal Claims, the finding of a scintilla does not mandate a finding of reasonable basis. Cottingham v. Sec'y of Health & Hum. Servs., 159 Fed. Cl. 328, 336 (2022) (denying motion for review of decision not to award attorneys' fees and costs), aff'd without op., 2023 WL 7545047 (Fed. Cir. 2023).

In a precedential opinion regarding the reasonable basis standard, the Federal Circuit stated that medical records, affidavits, and sworn testimony all constitute objective evidence that could support reasonable basis. James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1379-81 (Fed. Cir. 2021). The Federal Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable

---

[7] Here, as in most cases, the Secretary has not argued that Mr. and Ms. Jaranilla lacked good faith.

[8] Mr. and Ms. Jaranilla argue that "Respondent's brief repeatedly conflates this reasonable basis standard with the entitlement standard, suggesting that the eventual inability to prove causation retroactively eliminates reasonable basis." Pet'rs' Reply at 2. The basis for this argument is not readily apparent. The Secretary contended "a petitioner must offer more than a mere scintilla of objective evidence, but less than a preponderance of proof." Resp't's Resp. at 11. This description of petitioners' burden is correct.

basis, especially when the case is in its early stages and counsel may not have had the opportunity to retain qualified experts." Id. at 1379 (citing Cottingham, 971 F.3d at 1346).

More recently, the Federal Circuit held a special master may structure the analysis around the Althen prongs when assessing whether there is a reasonable basis supporting the claims set forth in a petition. Sheller v. Sec'y of Health & Hum. Servs., 121 F.4th 1301, 1305-07 (Fed. Cir. 2024). In doing so, the special master should recognize that the quantum of evidence for reasonable basis is lower than the quantum of evidence for entitlement. Id. The Federal Circuit "caution[ed] against a rigid application of the Althen factors because a rigid application, which requires some quantum of evidence for each Althen factor, could exceed what is required to establish a 'reasonable basis.'" Id.[9]

Although the reasonable basis standard does not set an especially high bar, evaluations of reasonable basis must contain sufficient detail to allow an appellate court to review the reasoning. Stratton v. Sec'y of Health and Hum. Servs., 138 F.4th 1368, 1378 (Fed. Cir. 2025).

## IV. Analysis Part One—Reasonable Basis

With respect to the five statutory elements found in 42 U.S.C. § 300aa–11(c)(1), Mr. and Ms. Jaranilla easily satisfy four of them. These uncontested elements are (A) receiving a vaccine listed in the Vaccine Injury Table, (B) receiving the vaccine in the United States, (D) suffering the consequence of the injury for more than six months, and (E) not previously collecting compensation. Thus, the only disputed item is causation, which is in paragraph (C). In cases like the present one in which petitioners do not assert a claim based upon the Vaccine Injury Table, to receive compensation, petitioners must establish with preponderant evidence that the vaccine was the cause in fact of an injury. Petitioners establish causation-in-fact by meeting the three prongs set out in Althen v. Sec'y of Health and Hum. Servs., 418 F.3d 1274 (Fed. Cir. 2005). These are: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Id. at 1278.

A deficiency of proof on causation can justify finding the petitioner lacked reasonable basis. See Cottingham, 971 F.3d at 1346 (stating "[b]ecause "causation is a necessary element of a petition," a petitioner "must point to evidence of a causal relationship" to establish reasonable basis and remanding); Cottingham, 159 Fed. Cl. at 328 (denying a motion for review of decision finding a lack of reasonable basis due to insufficient evidence regarding causation); Chuisano v.

[9] By way of contrast, petitioners must fulfill all three Althen prongs to receive compensation. W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d 1352, 1358 (Fed. Cir. 2013) ("a petitioner must establish all three prongs of the Althen test").

United States, 116 Fed. Cl. 276, 288–89 (Fed. Cl. 2014) ("reasonableness may [] come into question if . . . the lack of supporting evidence becomes apparent").

Given that the Federal Circuit has stated that to establish reasonable basis, petitioners "must point to evidence of a causal relationship," Cottingham, 971 F.3d at 1346, Mr. and Ms. Jaranilla would have been well served to identify evidence supporting a causal relationship. However, neither their initial brief nor their reply has structured any argument around the Althen prongs. Viewed through the Althen framework, the evidence provides little support for causation. On the first Althen prong, Mr. and Ms. Jaranilla failed to present a medical theory causally connecting the vaccinations with the injury. Entitlement Decision, 2025 WL 604404, at *2. On the second prong, Mr. and Ms. Jaranilla have not identified any treating doctor who stated the childhood vaccinations caused B.J.'s neurologic problems. On the third prong, Dr. Niyazov identified a relatively long latency between the vaccination and the onset of seizures. Pet'rs' Fees Mot. at pdf 95 (email from Aug. 4, 2022). These considerations do not favor a finding of reasonable basis. They are not, however, independently dispositive. As Sheller instructs, the Althen factors should not be applied rigidly in assessing reasonable basis. Sheller, 121 F.4th at 1307. Accordingly, the evidence upon which Mr. and Ms. Jaranilla actually rely is considered below.

A close reading of Mr. and Ms. Jaranilla's brief and reply reveals that they are relying upon some evidence. Mr. and Ms. Jaranilla cite the reports from Dr. Niyazov (Exhibits 20 and 34) as well as emails from Dr. Steinman. This evidence is evaluated below in the chronological order in which it was created. Mr. and Ms. Jaranilla are also relying upon their good faith investigation and various policy positions.[10]

*Dr. Steinman's Emails*

As part of their reply, Mr. and Ms. Jaranilla submitted additional email correspondence between Attorney Firestone and Dr. Steinman from June 29, 2021, before the petition was filed. Pet'rs' Reply pdf 6-10. In that correspondence, Attorney Firestone asked Dr. Steinman for his initial impression of the case and whether he would assist in developing a medical theory of causation. Dr. Steinman responded that he was sympathetic to the case but did not believe he would be effective without a pediatric geneticist also serving as an expert. He added that "[t]he role of a neuroinflammatory arm in this medical mystery is certainly a possibility" and that he would not want to handle the matter alone.

As a preliminary matter, this "evidence" is procedurally questionable for two reasons. First, evidence that arguably supports reasonable basis should be filed as part of the entitlement phase of the case. See Goodgame v. Sec'y of Health & Hum. Servs., 157 Fed. Cl. 62, 72 (2021).

[10] Mr. and Ms. Jaranilla have not cited any specific statements from treating doctors as supporting the reasonable basis for their claim that the childhood vaccines harmed B.J.

Second, Mr. and Ms. Jaranilla have crafted a new argument in their reply, which is generally poor practice. See SmithKline Beecham, Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006). Adding a new argument in a reply brief is an especially poor practice when the argument is based upon material (emails between an attorney and potential expert) that has not been disclosed to the other party previously.

Nevertheless, any procedural miscues can be overlooked because Dr. Steinman's emails do not advance Mr. and Ms. Jaranilla's burden with respect to causation.

These emails show that at the end of June 2021, Ms. Jaranilla communicated with Attorney Firestone and provided him with several medical records. She also summarized what happened to B.J. in a few paragraphs. Attorney Firestone forwarded this material to Dr. Steinman and asked whether Dr. Steinman saw it "as a viable claim"? About 90 minutes later, Dr. Steinman stated:

> I am sympathetic. I don't think I would be effective in this case without a pediatric geneticist to also serve as an expert.
>
> The role of a neuroinflammatory arm in this medical mystery is certainly a possibility.
>
> I would not want to handle this one solo.

With that response, Mr. Firestone planned to retain a pediatric geneticist as well as a neuroradiologist.

This communication from Dr. Steinman does not constitute a scintilla of evidence supporting causation. It is not clear that Dr. Steinman reviewed the medical records, which provide details about B.J.'s case. At best, Dr. Steinman is saying that with support of other experts, there is a possibility that he would get involved in the case. Dr. Steinman has not promised to write a report, and he has not expressed any theory to explain how a vaccine might have caused B.J.'s seizures. Dr. Steinman has not addressed the latency (16 days) between the vaccination and the first seizures.

*Dr. Niyazov's First Letter*

In September 2022, United Healthcare denied a request for whole genome sequencing on the ground that this procedure was "unproven." Exhibit 19 at 3. The insurance company's medical director, Dan Beruti, informed Ms. Jaranilla that she could appeal and submit more information.

In this context, Dr. Niyazov wrote a "To whom it may concern" letter, dated December 5, 2022. Dr. Niyazov strongly recommended whole genome sequencing. B.J.'s history, to Dr. Niyazov, "raises a legitimate question whether a rare genetic defect is present in [B.J.] that has been elusive so far on multiple tests including Whole Exome Sequencing." Exhibit 20 at 1. Dr.

Niyazov stated that whole genome sequencing "could prove invaluable in finding a rare cause of [B.J.'s] condition and may pave a way to explain a role of the vaccines and benefits to her current management." Id.

This letter also does not constitute a scintilla of evidence supporting causation. Dr. Niyazov essentially proposes a two-step possibility—it is possible B.J. has a rare genetic condition and it is possible that this [as of yet unidentified] genetic condition contributed to a vaccine reaction. Dr. Niyazov does not propose any theory by which the childhood vaccines caused B.J.'s seizures. Although Dr. Niyazov sets forth an accurate timeline, he did not explain how the approximately 16-day gap between the vaccinations and seizures could be bridged. He did not assert that the vaccines caused her seizures.

*Dr. Niyazov's Second Letter*

After United Healthcare revised its policy to allow for more whole genome sequencing, B.J. underwent that test. The testing revealed variants in the *COQ8A* gene and in the *WARS2* gene. Dr. Niyazov's September 16, 2024 letter refers to these findings.

Dr. Niyazov "strongly recommend[ed] . . . RNA sequencing of the COQ8A gene. . . . [T]his RNA test would be relevant to possibly finding a genetic predisposition to [B.J.'s] regression from vaccines." Exhibit 34 at 1. Dr. Niyazov proposed that B.J. might fit the phenotype of COQ10D4 that "could explain a detrimental effect of vaccines by aggravation of COQ10D4." Id. at 2. How the vaccinations could aggravate COQ10D4 was not hypothesized at all. As previously noted, the reference materials Dr. Niyazov cited described COQ10D4 deficiency as an "autosomal recessive" problem and the reference materials do not mention vaccinations.

Dr. Niyazov's second letter, too, does not constitute a scintilla of evidence supporting any of the Althen prongs. Dr. Niyazov does not say that a childhood vaccine caused B.J.'s neurologic problem. Dr. Niyazov does not propose a theory by which any childhood vaccine could aggravate an underlying genetic condition, such as COQ10D4. Dr. Niyazov does not discuss the latency between the vaccination and B.J.'s initial seizures. Dr. Niyazov does not assert that there is a logical sequence between the childhood vaccinations and B.J.'s seizures.

*Summary regarding "Evidence"*

The primary evidence that Mr. and Ms. Jaranilla cite in their brief and reply is the series of communications from Dr. Steinman and Dr. Niyazov. Taken individually or collectively, the statements from Dr. Steinman and Dr. Niyazov do not meet Mr. and Ms. Jaranilla's burden to establish that reasonable basis supports their claim that the childhood vaccines caused harm to B.J. Rather than address the relevant statutory metric, which is "causation" (see 42 U.S.C. § 300aa–11(c)(1)(C)), Dr. Steinman and Dr. Niyazov propose further investigation. Investigation is discussed next.

*Counsel's Investigation*

Mr. and Ms. Jaranilla's brief and reply emphasize repeatedly that Attorney Firestone was investigating whether the childhood vaccines could have harmed B.J. A sample of their contentions include:

- "Petitioners, under expert advice, pursued Whole Genome Sequencing and RNA testing—state-of-the-art tools in rare disease diagnosis. Their pursuit of additional molecular data was medically and legally appropriate and consistent with a good-faith effort to prove their claim." Pet'rs' Fees Mot. at 4.
- "With [Dr. Niyazov's] support and clinical suspicion of COQ8A-related mitochondrial dysfunction, Petitioners pursued advanced testing and expert analysis to determine whether B.J.'s profound neurological regression following routine vaccinations could be attributed to a vaccine-related significant aggravation." Pet'rs' Fees Mot. at 5.
- "Petitioners reasonably believed that the vaccine caused B.J.'s injury and, under the guidance of experts, pursued that theory through systematic testing. Each test ruled out potential causes and progressively narrowed the field of possible etiologies until the final test—whole exome [sic] sequencing—confirmed the presence of a rare, likely causative WARS2 genetic variant." Pet'rs' Reply at 3.[11]

These accounts of a good faith investigation appear to be accurate, but are not relevant to the assessment of reasonable basis. A binding opinion from the Federal Circuit distinguished the "objective" evidence supporting reasonable basis from "counsel's conduct." Simmons, 875 F.3d at 636.

The Vaccine Act conditions a discretionary award of attorneys' fees and costs upon a special master's finding of two things, "good faith" and a "reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa—15(e). A basic cannon of statutory interpretation is each term in a statute should have some meaning. Mudge v. United States, 308 F.3d 1220, 1228 (Fed. Cir. 2002).

The Federal Circuit recognizes "good faith" and a "reasonable basis" as "'two distinct facets.'" Simmons, 875 F.3d at 635, quoting Chuisano v. United States, 116 Fed. Cl. 276, 289 (2014). In doing so, the Federal Circuit accepted the Secretary's argument that "by considering [the] attorney's conduct as part of the reasonable basis assessment, [the special master] folded the subjective good faith provision into the reasonable basis requirement, and effectively either rendered the 'good faith' language [in § 300aa–15(e) (1)] superfluous, or the 'reasonable basis' language meaningless." Id.

---

[11] The testing in 2024 was on the entire genome, not just the exome.

Dividing counsel's conduct from the objective inquiry into reasonable basis is a sensible separation. If an attorney could fulfill the reasonable basis standard by simply investigating a claim, then when would the reasonable basis standard carry any consequences? As the Court of Federal Claims stated, "[e]fforts to compile evidence do not necessarily ensure that a claim is supported by a reasonable basis." McCoy v. Sec'y of Health & Hum. Servs., 178 Fed. Cl. 749, 757 (2025) (denying motion for review of decision finding a lack of reasonable basis).[12] That distinction is important here. The record reflects efforts by petitioners and their counsel to investigate whether a viable vaccine-causation theory could be developed. Those efforts, however, do not themselves establish reasonable basis. "Reasonable basis focuses on what evidence counsel has, not what he wants." Honeycutt v. Sec'y of Health & Hum. Servs., 180 Fed. Cl. 532, 535 (2026) (emphasis in original). The relevant question remains whether the investigation yielded objective evidence supporting the claim. Accordingly, the fact that petitioners consulted experts and pursued additional genetic and RNA testing must be distinguished from whether the results of those efforts supplied objective evidence supporting a causal relationship between B.J.'s vaccinations and her injuries.

In this case, neither treating doctors, nor Dr. Steinman, nor Dr. Niyazov opined that the childhood vaccines harmed B.J. Without this evidence, it is difficult to see how a "scintilla" of evidence supports the claim set forth in the petition, which is that the childhood vaccines *caused* B.J.'s injury. The record contains evidence explaining why Mr. and Ms. Jaranilla suspected a vaccine connection, but substantially less medical evidence supporting that connection. B.J.'s parents expressed concern that her seizures began after her vaccinations, and one treating neurologist acknowledged that a vaccine trigger was "possible," while also observing that B.J.'s presentation did not fit cleanly within a post-vaccination syndrome. Before the petition was filed, Dr. Steinman likewise described a neuroinflammatory component as a "possibility," but offered no theory connecting the vaccinations to B.J.'s injury and indicated that additional expertise was necessary. Shortly after filing, Dr. Niyazov identified the 16-day latency and intervening period of normalcy as features that raised questions about a vaccine-related explanation. Thus, the difficulty is not merely that Petitioners lacked a definitive causation opinion when they filed their petition. Rather, the medical evidence reflected suspicion and possibilities warranting further investigation, but did not supply affirmative support for the causal relationship alleged in the petition. Moreover, unlike Sheller, 121 F.4th 1301, Mr. and Ms. Jaranilla have not cited any case with a set of facts similar to B.J.'s facts in which a special master awarded compensation.

It bears repeating that Mr. and Ms. Jaranilla bear the burden of establishing reasonable basis. McKellar, 101 Fed. Cl. at 305. Although reasonable basis requires less than the

---

[12] Although Mr. and Ms. Jaranilla cite Sheller v. Sec'y of Health & Hum. Servs., 121 F.4th 1301 (Fed. Cir. 2024), in their Reply, Mr. and Ms. Jaranilla did not argue that any special circumstances, such as an intervening adverse appellate precedent, prevented them from obtaining a report from an expert.

preponderant evidence necessary to establish entitlement, it nevertheless requires objective evidence supporting the claim. Here, the evidence when viewed most favorably to Mr. and Ms. Jaranilla is essentially a collection of statements that it is possible that the childhood vaccines could have harmed B.J. without spelling out how this harm could have occurred, or when this harm would have occurred, or that this vaccine-related harm did in-fact occur. As such, this evidence does not meet the reasonable-basis standard.

*Policy Does Not Mandate an Award of Attorneys' Fees and Costs*

As often argued in cases involving disputes over reasonable basis, petitioners argue that the Vaccine Act "is designed to ensure that claimants have access to competent legal representation without fear of financial burden." Pet'rs' Br. at 4, citing Sebelius v. Cloer, 569 U.S. 369, 380 (2013). They extend this argument by contending "This case exemplifies the value of the Vaccine Program as not only a compensation mechanism, but also as a vehicle for scientific accountability and the responsible resolution of medically complex claims." Id. at 5. For this proposition, Mr. and Ms. Jaranilla did not cite any authority.

The undersigned is not familiar with any cases that characterize the National Childhood Vaccine Injury Compensation Program as "a vehicle for scientific accountability and the responsible resolution of medically complex claims." Certainly, some vaccinees such as B.J. suffer from "medically complex" conditions. However, Congress conditioned discretionary awards of attorneys' fees upon a finding of "good faith" and "reasonable basis." Congress did not say that petitioners should be awarded attorneys' fees because their cases are complex.

The undersigned was called upon to discuss the policy choices in compensating or not compensating attorneys. The undersigned explained that Congress's creation of a reasonable basis test reflects Congress's choice that some attorneys would not be compensated. Cottingham v. Sec'y of Health & Hum. Servs., No. 15-1291V, 2021 WL 6881248, at *24-26 (Fed. Cl. Spec. Mstr. Sep. 27, 2021), mot. for rev. denied, 159 Fed. Cl. 328 (2022), aff'd without op., 2023 WL 7545047 (Fed. Cir. 2023).

Ultimately, Mr. and Ms. Jaranilla's argument that they are eligible for an award of attorneys' fees and costs comes down to the "objective" support for their claim and the lack thereof. See Simmons, 875 F.3d at 636. Again, Mr. and Ms. Jaranilla's burden on this issue is less than the preponderance of evidence. But, even at that lower standard, Mr. and Ms. Jaranilla have not demonstrated their eligibility for attorneys' fees and costs. The failure ultimately to establish vaccine causation does not, by itself, demonstrate that a petition lacked reasonable basis. Here, however, the problem is not merely that petitioners ultimately failed to prove causation. Rather, neither the objective evidence available when the petition was filed *nor the evidence subsequently developed during the litigation* supplied more than a scintilla of evidence connecting B.J.'s vaccinations to her neurologic injuries.

The course of the litigation did not cure that evidentiary deficiency, as the causation evidence did not meaningfully change. When Mr. and Ms. Jaranilla filed their petition, Mr.

Firestone possessed an (unfiled) email from Dr. Steinman that neuroinflammation is possible. During the litigation, Mr. and Ms. Jaranilla added two letters from Dr. Niyazov that, in essence, sought more information in the form of genetic testing but did not supply the missing causal support. Thus, although Petitioners continued to investigate whether a vaccine-related explanation could be developed, the evidence developed through that investigation did not materially strengthen the objective basis for vaccine causation.

For the reasons explained above, the evidence, *considered as a whole*, is insufficient to meet the reasonable basis standard. It, therefore, follows that petitioners did not fulfill the reasonable basis standard earlier in the litigation when there was *less* evidence. Therefore, the motion for attorneys' fees and costs is denied.[13]

## V. Analysis Part Two—Consequence of No Reasonable Basis

Because Mr. and Ms. Jaranilla did not meet their burden to establish the reasonable basis for the claim set forth in the petition, they are not eligible for an award of attorneys' fees and costs. The Vaccine Act provides: "No attorney may charge any fee for services in connection with a petition filed under section 300aa-11 of this title which is in addition to any amount awarded as compensation by the special master or court under paragraph (1)." 42 U.S.C. § 300aa–15(e)(3). The phrase "fee for services" includes items such as "filing fees [and] expert witness reimbursement." Beck v. Sec'y of Health & Hum. Servs., 924 F.2d 1029, 1032 (Fed. Cir. 1991).

Via the present decision, the undersigned has determined that the appropriate amount of attorneys' fees and costs is zero. However, Mr. and Ms. Jaranilla's counsel has collected $3,000.00 from them. Statement of Petitioner's Personal Costs found as pdf 50 to petitioners' fees motion.

The remedy for this overcharge is for Mr. and Ms. Jaranilla's attorney to refund the money he has received from his client. See K.O. v. Sec'y of Health & Hum. Servs., No. 13-472V, 2017 WL 4385751, at *5-6 (Fed. Cl. Spec. Mstr. Oct. 3, 2017) (requiring reimbursement from a law firm to a client). Accordingly, Mr. and Ms. Jaranilla's attorney is ORDERED to file

[13] Given that Mr. and Ms. Jaranilla have not met their burden of establishing that they are eligible for attorneys' fees and costs, two other questions are not addressed. First, when a petitioner is found to have established reasonable basis, a special master retains discretion to award (or not to award) attorneys' fees. James Cornelius, 984 F.3d at 1379. This discretionary aspect is not resolved here. Second, if Mr. and Ms. Jaranilla were to receive any attorneys' fees and costs, any amounts would need to be reasonable. 42 U.S.C. § 300aa-15(e). The reasonableness of Mr. and Ms. Jaranilla's proposed attorneys' fees and costs is also not addressed.

a status report confirming he has reimbursed Mr. and Ms. Jaranilla within 45 days of this decision.

## VI. Conclusion

Mr. and Ms. Jaranilla have not established a reasonable basis to support the petition's claim that the childhood vaccines caused B.J. to suffer seizures or other neurologic problems. Without a showing of reasonable basis, Mr. and Ms. Jaranilla cannot be awarded their attorneys' fees and costs. Thus, the motion for attorneys' fees and costs is DENIED.

1. The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.[14]

2. Within 45 days, Mr. and Ms. Jaranilla's attorney is ORDERED to file a status report, confirming he has reimbursed Mr. and Ms. Jaranilla with the $3,000.00, which he collected from them excessively.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master

[14] Information regarding the content and deadline for a motion for review is available in the Vaccine Rules posted to the Court's website.